# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2231

_____

Richard Yang,

*Plaintiff - Appellant,*

v.

Missouri Department of Corrections; George Lombardi, Director, MDOC; John Doe; Tom Clements, Director of Division of Adult Institutions; Mariann Atwell, Director, Division of Offender Rehabilitative Services; Patricia Cornell, Deputy Division Director; Fred Johnson, Deputy Warden, Potosi Correctional Center; Don Roper, Warden, Potosi Correctional Center; Omer L. Clark, Deputy Warden, Southeast Correctional Center; William (Bill) Stange, Deputy Warden, Southeast Correctional Center; Allan Hughes, Committee Member, Southeast Correctional Center; Angela Riddell, CCA, Southeast Correctional Center; Dwayne Kempker, Deputy Director, Division of Adult Institutions; K. Malloy, Functional Unit Manager, Potosi Correctional Center; G. Phagley, Committee Member, Potosi Correctional Center; Cindy Griffin, Functional Unit Manager, Potosi Correctional Center,

*Defendants - Appellees.*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: April 14, 2016
Filed: August 15, 2016

_____

Before COLLOTON and SHEPHERD, Circuit Judges, and MOODY,[1] District Judge.

_____

COLLOTON, Circuit Judge.

Richard Yang, an inmate in Missouri, appeals the dismissal of his lawsuit against several officials of the Missouri Department of Corrections under 42 U.S.C. § 1983. Yang alleged that the officials violated his constitutional rights when they censored his Chinese-language mail and denied him the ability to place telephone calls to China. The district court[2] granted summary judgment for the officials, and we affirm.

I.

Yang was born in China in 1940. He moved to the United States in 1984 and is now a citizen. Yang has been incarcerated in the Missouri Department of Corrections since 2005, when he was sentenced to twenty years in prison for second-degree murder.

Yang's first language is Mandarin Chinese. He can speak, read, and write English, although he claims he cannot fully express himself in English. Yang's relatives remain in China, and none of them understands English.

When he was first imprisoned, the Department allowed Yang to correspond in Chinese. But from late 2007 to some point in 2008, and again after January 2011,

_____

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas, sitting by designation.

[2]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

Department officials refused for security reasons to deliver Yang's incoming and outgoing mail written in Chinese.

The officials restricted Yang's Chinese-language mail pursuant to the Department's censorship and mail policies. Those policies provide for censoring of mail that poses a threat to the security of the penal institution. Items written in a "language that staff are unable to interpret with current available resources" are said to present such a threat. Thus, all mail in a foreign language is sent to a committee that determines whether an employee-interpreter is available by reviewing the Department's "institutional translator list." If an employee can interpret the mail, it is sent to that employee for review and screening before delivery to its intended destination. But if no employee on the list can interpret the mail, the committee censors the mail and informs the inmate of the basis for its decision.

At all times relevant to this litigation, no Department employees could read or translate Mandarin Chinese. Because several employees knew Spanish, however, the Department screened other inmates' Spanish-language mail during the periods when Yang's Chinese-language mail was rejected.

Yang twice complained about the treatment of his mail through the Department's grievance process. He explained that his family was unable to understand English, requested permission to send and receive Chinese-language mail, and demanded that the Department provide an interpreter who could review the mail and clear it for delivery. Department officials denied Yang's grievances.

Yang also sought to place telephone calls to his family and friends in China. Before February 2012, the Department prohibited all international calls. After that date, international calling was permitted, but Yang temporarily remained unable to call people in China due to technical difficulties. The Department's international-calling provider resolved those issues, and Yang may now call his family in China.

-3-

Throughout his time in prison, Yang has been able to place domestic telephone calls and to send and receive English-language mail. Yang mailed a couple letters in English to his family in China. Yang also attempted to contact a few acquaintances in the United States by mail and telephone. The recipients of Yang's communications, including family members in China, neither responded to his letters nor accepted his phone calls.

In May 2012, Yang, proceeding *pro se*, brought a § 1983 action against the Department and several officials. Yang alleged that the defendants had infringed his rights under the First Amendment, the Equal Protection Clause, and the Due Process Clause by denying him the ability to correspond in Chinese or to place telephone calls to his family and friends in China. Yang sought declaratory and injunctive relief, as well as money damages for past constitutional violations.

The district court dismissed Yang's complaint against the Department for failure to state a claim and granted summary judgment for the officials. Yang appealed the summary-judgment orders *pro se*, and the court appointed counsel to represent Yang at oral argument. The court expresses its appreciation to appointed counsel for his zealous efforts on Yang's behalf.

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review the district court's ruling *de novo*, viewing the evidence in the light most favorable to Yang. *Murphy v. Mo. Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004).

II.

Yang first asserts that the officials violated his First Amendment rights. A prison inmate retains those First Amendment rights that are not "inconsistent with his

status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). These include the right to communicate with persons outside the prison walls, subject to regulation that protects legitimate governmental interests. *Procunier v. Martinez*, 416 U.S. 396, 412-13 (1974); *Thongvanh v. Thalacker*, 17 F.3d 256, 258 (8th Cir. 1994); *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989).

When a prison regulation impinges on an inmate's ability to communicate with others, it is valid if it is "reasonably related to legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 89, 99 (1987); *Ortiz v. Fort Dodge Corr. Facility*, 368 F.3d 1024, 1026 & n.2 (8th Cir. 2004). In making that determination, we consider (1) whether the regulation is rationally connected to a legitimate and neutral governmental interest; (2) whether the inmate has an alternative means of exercising the constitutional right; (3) the impact accommodating the inmate's asserted right would have on prison staff, prisoners, and resources; and (4) whether ready alternatives to the regulation exist. *Turner*, 482 U.S. at 89-91; *see also Thornburgh v. Abbott*, 490 U.S. 401, 414-19 (1989). Yang bears the burden of proving that the Department's regulations are unreasonable. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Yang's lawsuit spans many years of his incarceration, and the precise nature of his claims varies based on the correctional policies in effect at a given time. The broadest complaint is that the Department officials unreasonably restricted his First Amendment rights when they censored his Chinese-language mail and prohibited international calling at the same time.

We conclude, however, that the restrictions were reasonably related to legitimate penological objectives. The rules were rationally related to the legitimate governmental interest in security: If prison officials could not monitor an inmate's communications with people outside the facility in an unfamiliar language, then they

would be vulnerable to escape, smuggling of contraband, and other planning of criminal activity. *See Ortiz*, 368 F.3d at 1026; *see also Murchison v. Rogers*, 779 F.3d 882, 887 (8th Cir. 2015). Both the mail and telephone regulations were "neutral," in the sense that they "further[ed] an important or substantial governmental interest unrelated to the suppression of expression." *Abbott*, 490 U.S. at 415-16 (internal quotation omitted). Yang had alternative means of communicating with outsiders. He retained the ability to make domestic calls, send correspondence in English, and receive visitors. *See Ortiz*, 368 F.3d at 1027.

Yang objects that his family in China cannot understand English, and that he cannot fully express himself by writing in a second language. But an alternative "need not be ideal," *Overton*, 539 U.S. at 135, and Yang's *pro se* pleadings in this litigation demonstrate that he can communicate adequately in English. Yang testified that he believed that there was a translation service in the city where his family resides, and the Constitution does not require the State to bear the burden of paying for translation in any event. *Ortiz*, 368 F.3d at 1027.

Yang has not demonstrated that there is a readily available alternative that would have eased the restriction on his ability to communicate without imposing financial burdens on the State. He suggests that the Department could arrange a translator for his mail. This court required that step in *Thongvanh*, where a refugee service center offered a cost-free translation service, and officials gave no explanation why foreign-language correspondence could not be routed through the center. 17 F.3d at 258-59. But Yang has not identified a cost-free way for the Department to monitor his non-English correspondence, and prison officials are not required to absorb more than a *de minimis* cost to facilitate foreign-language communications. *Ortiz*, 368 F.3d at 1027. The district court, therefore, correctly rejected Yang's First Amendment claim based on the periods when Yang could neither correspond in Chinese nor place international telephone calls.

The officials, *a fortiori*, did not violate Yang's rights during periods when he could correspond in Chinese, but was prohibited from placing international telephone calls. The current policies likewise pass muster. Under those rules, Yang may communicate via international or domestic telephone calls in Chinese or English, by mail in English, or through in-person visits. One might see tension between a regulation that forbids correspondence written in Chinese but allows telephone calls in foreign tongues, but a prison rule that addresses a legitimate security concern is not unreasonable merely because it is underinclusive. *See Ortiz*, 368 F.3d at 1026-27; *see also Murchison*, 779 F.3d at 890.

Yang next contends that the Department officials violated his equal protection rights when they treated him less favorably than Spanish-speaking inmates. Yang argues that the officials translated and screened Spanish-language mail but rejected his Chinese-language mail. Yang also asserts that after the Department allowed international telephone calling in February 2012, Spanish-speaking inmates were able to place calls to Mexico immediately, while he remained unable to call his family and friends in China.

There is no evidence that differential treatment of foreign-language mail was motivated by race or national origin or that the treatment of Chinese-language mail was a pretext for discrimination. *See Weiler v. Purkett*, 137 F.3d 1047, 1051-52 (8th Cir. 1998) (en banc). The only evidence on this point shows that prison officials arranged for translation of Spanish-language mail because employees with language skills were available to read it, while there was no staff able to translate Chinese. For the reasons discussed, the Department's approach to Chinese-language mail was reasonably related to legitimate penological objectives. It was not a racial classification subject to heightened scrutiny. *Cf. Johnson v. California*, 543 U.S. 499, 510-12 (2005). Similarly, any difference in timing between the authorization of inmate telephone calls to Mexico and calls to China was explained by technical

difficulties of a third party, not by discrimination at the hands of state officials based on race or national origin.

Yang raises a procedural due process claim, arguing that the officials did not give him notice of appeal rights and an opportunity to appeal the Department's denials of his grievances. This claim is belied by evidence that Yang twice exhausted the Department's grievance procedures, including his right to appeal. Yang was able to exhaust his claims administratively and to litigate them in federal court, so there is no showing of an injury from any alleged procedural irregularities. *See Knight v. Lombardi*, 952 F.2d 177, 179 (8th Cir. 1991).

\* \* \*

For the foregoing reasons, the judgment of the district court is affirmed.

_____